IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CULLEN LATHAM ROBERTS,<br><br>*Defendant*. | <u>UNDER SEAL</u><br><br>Case No.  1:20-MJ-332 |

**AFFIDAVIT IN SUPPORT OF**
<u>**CRIMINAL COMPLAINT AND ARREST WARRANT**</u>

I, Samad D. Shahrani, first being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed as an FBI Special Agent since September 2011. I am currently assigned to a Hi-Tech Organized Crime squad based at the Northern Virginia Resident Agency of the FBI's Washington Field Office. I was previously assigned to the FBI's New York Field Office from completion of my training in February 2012, until my transfer to the Washington Field Office in April 2019. While in New York, I was assigned to a Cyber Criminal Computer Intrusion squad from approximately October 2012 until April 2019. The focus of that squad was to investigate computer hacking and associated computer-facilitated criminal activity.

2. I have experience investigating violations of narcotics trafficking offenses and computer-facilitated crimes. I have sworn to affidavits in support of arrest warrants and search warrants for computer hacking violations, as well as violations pertaining to illegal narcotics, monies or proceeds derived from the sale of illegal narcotics, and records, ledgers, and documents

pertaining to the purchase and sale of controlled substances.  I have also conducted and participated in narcotics and money laundering investigations resulting in the arrest and conviction of drug distributors, and seizures of controlled substances, including prescription drugs.  As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances.  Additionally, I am familiar with the functioning and structure of narcotics markets operating on internet-based Darknets ("Darknet markets") including the operations of Darknet market administrators ("admins"), the sellers on such markets ("vendors"), and the purchasers on such markets ("buyers").

3.  I am submitting this affidavit in support of an arrest warrant and a criminal complaint charging the defendant, Cullen Latham ROBERTS ("ROBERTS"), with distribution of controlled substances, including oxycodone, oxymorphone, and amphetamine, all Schedule II controlled substances; and alprazolam (brand name: Xanax) and tramadol, both Schedule IV controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).  ROBERTS carries out his distribution of controlled substances by way of the Darknet.

4.  This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my or the government's knowledge about this matter.  All information contained in this affidavit is either personally known to me, has been communicated to me by other law enforcement officers, or has been described in reports, records, or documents gathered during this investigation that I have reviewed.  When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not necessarily intended to constitute a verbatim recitation of the entire statement.

## TECHNICAL BACKGROUND

5. Digital currency (also known as cryptocurrency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government). Digital currency exists entirely on the internet and is not stored in any physical form. Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

6. Bitcoin[1] is a type of digital currency. Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity. Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals. An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger. Individuals are rewarded for this by being given newly created Bitcoins.

7. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on any type of computer, including laptop computers and smart phones.

8. Bitcoins can be stored in digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and

---

[1] Between December 31, 2019 and November 12, 2020, the value of one Bitcoin fluctuated between approximately $3,858.00 USD and approximately $16,169.00 USD according to Coinbase, a cryptocurrency exchange that, among other cryptocurrencies, deals in Bitcoin.

a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account.

9. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

10. Through the dark web or "Darknet," which consists of websites accessible only through encrypted means, individuals have established online marketplaces for narcotics and other illegal items. These markets often only accept payment through digital currencies, such as Bitcoin. Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items. Individuals intending to purchase illegal items on Darknet websites need to purchase or barter for Bitcoins. Further, individuals who have received Bitcoin as proceeds of illegal sales on Darknet websites need to sell their Bitcoin to convert them to fiat (government-backed) currency. Such purchases and sales are often facilitated by peer-to-peer Bitcoin exchangers, who advertise their services on websites designed to facilitate such transactions.

11. Bitcoin may be converted into other digital currencies and vice versa. These transactions can be facilitated by entities operating as digital currency exchanges or by individual peer-to-peer transactions where digital currency of one type is exchanged for digital currency of another type, or for cash fiat currency. One such digital currency is Monero (XMR), which does not have a visible public ledger, making it more difficult to trace than Bitcoin.

12. Darknet sites primarily operate on the Tor network ("Tor"). Tor stands for "the onion router" and is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" or "onion services" ("hidden services") on Tor. Such "hidden services" operating on Tor have complex web addresses, generated by a computer algorithm, which end in ".onion" and can only be accessed through specific web browser software designed or adapted to access the Tor network. These addresses are either 16 characters long (version 2 or "v2") or 56 characters long (version 3 or "v3").

13. A Darknet market ("DNM") is a black market that facilitates transactions involving a variety of products including prescription and illegal drugs, computer viruses and exploits, weapons, counterfeit currency, stolen credit card details, forged documents, unlicensed pharmaceuticals, steroids, and other illicit goods, as well as the sale of legal products. Well-known DNMs include the now-defunct markets known as Silk Road, Silk Road 2.0, AlphaBay, and Empire. Vendors on DNMs typically have profile pages that show information about the vendor and feedback ratings from their buyers.

**PROBABLE CAUSE**

*The Darknet Vendor "PILLPUSHER"*

14. Since July 15, 2020, the FBI, in conjunction with the U.S. Postal Inspection Service (USPIS) and other law enforcement agencies, has been conducting a criminal investigation of a DNM vendor that operates under the moniker PILLPUSHER on the DNM known as YELLOW BRICK. According to PILLPUSHER's profile page on YELLOW BRICK, PILLPUSHER has

operated on YELLOW BRICK since approximately April 27, 2020. As of November 12, 2020, PILPUSHER had a 100% positive feedback rating from their buyers on the market. PILLPUSHER accepted payments for the drugs PILLPUSHER sold via cryptocurrency, specifically via Bitcoin.

*Initial Undercover Purchases from PILLPUSHER*

15. In and around July 2020, agents of the FBI conducted three separate undercover purchases of controlled substances from PILLPUSHER through the YELLOW BRICK market. Specifically:

16. On or about July 3, 2020, an employee of the FBI acting in an undercover capacity (the "UC") placed an order with PILLPUSHER for ten 40-mg oxymorphone pills (brand name: Opana). On July 13, 2020, FBI agents retrieved the ordered package from a mailing location in the Eastern District of Virginia. The package had been mailed via the U.S. Postal Service from Cumming, Georgia, to the Eastern District of Virginia. The package was opened and contained what appeared to be prescription pills. The pills were submitted to the DEA's Mid-Atlantic Laboratory for testing, and analysis confirmed that the pills contained the Schedule II controlled substance oxymorphone.

17. On or about July 22, 2020, the UC placed an order with PILLPUSHER for ten 80-mg oxycodone pills. On July 27, 2020, FBI agents retrieved the ordered package from a mailing location in the Eastern District of Virginia. This package had also been mailed via the U.S. Postal Service from Cumming, Georgia, to the Eastern District of Virginia. The package was opened and contained what appeared to be prescription pills. The pills were submitted to the DEA's Mid-Atlantic Laboratory for testing, and analysis confirmed that the pills contained the Schedule II controlled substance oxycodone.

18. On or about July 30, 2020, the UC placed an order with PILLPUSHER for twenty 25-mg tablets of dextroamphetamine-amphetamine (brand name: Adderall XR). On August 5, 2020, FBI agents retrieved the ordered package from a mailing location in the Eastern District of Virginia. This package had also been mailed via the U.S. Postal Service from Cumming, Georgia, to the Eastern District of Virginia. The package was opened and contained what appeared to be prescription pills. The pills were submitted to the DEA's Mid-Atlantic Laboratory for testing, and analysis confirmed that the pills contained the Schedule II controlled substance amphetamine.

*Surveillance of the Cumming (GA) Post Office*

19. On or about August 5, 2020, the UC placed an order with PILLPUSHER for ten 40-mg Opana oxymorphone pills.

20. The FBI relayed the shipping address for this order to a USPIS Postal Inspector in the Atlanta area. The Postal Inspector then conducted physical surveillance of the Post Office in Cumming, Georgia, on or about August 6, 2020.

21. During that surveillance, the Postal Inspector observed a young, white male with a slim build approach the retail counter of the Post Office and hand a Priority Mail envelope to the clerk. The clerk scanned the tracking number of the pre-printed postage label then handed a receipt to the young man. The young man then left the post office, got into a light-colored sedan, and drove away. The Postal Inspector was unable to obtain a license plate for the observed vehicle at that time.

22. The Postal Inspector seized the Priority Mail package that the young man had dropped off. The package was addressed to the covert mailing address in the Eastern District of Virginia that the UC had provided to PILLPUSHER.

23. The Postal Inspector repackaged the package and sent it to the FBI Washington Field Office. For reasons unknown—and which are currently under investigation—the package containing the seized envelope was last scanned at a United States Postal Service (USPS) sorting facility in Georgia and was delayed in reaching the FBI Washington Field Office. The package was eventually received on November 23, 2020. All seals on the package were intact, and the package was found to contain 10 pills consistent in appearance with oxymorphone. A preliminary field test on one of the pills returned a result of oxymorphone. These pills are pending submission to the DEA Mid-Atlantic laboratory. The tracking records for the original package were spoofed to show a successful delivery so as not to arouse PILLPUSHER's suspicions should they track the package.

24. As of August 6, 2020, there was no video surveillance of the interior or exterior of the Cumming Post Office. Subsequently, USPIS established video surveillance of both the interior and exterior of the building.

*Identification of ROBERTS*

25. On August 14, 2020, an interior camera at the Cumming Post Office captured footage of what appeared to be the same young, slim, white male observed at the Post Office on August 6. An exterior camera captured a silver 2004 Buick bearing Georgia license plate CJW1648 depart the parking lot of the Cumming Post Office shortly thereafter. The Postal Inspector identified this vehicle as the same light-colored sedan they had observed on August 6.

26. Georgia Department of Motor Vehicles (DMV) records revealed that the vehicle is registered to ROBERTS. DMV records for ROBERTS, which included a photograph, revealed that ROBERTS is listed as 22 years old, 6'2" tall, and weighing 132 lbs—a description consistent with the individual observed on video surveillance on August 14 and in person on August 6.

27. A check of the Georgia Board of Pharmacy website on September 23, 2020, revealed that ROBERTS was issued Pharmacy Technician license PHTC046430 on July 25, 2018, with a listed expiration date of June 30, 2019. At the time of review, the "license status" was listed as "Lapsed"; thus, I believe that ROBERTS does not have a current valid license to work as a pharmacy technician. The expired license was associated with CVS Pharmacy #2945, and the relationship was listed as "Employment." A review of the CVS website on October 5, 2020, revealed that the address of CVS Pharmacy #2945 is 13933 Alpharetta Highway in Milton, Georgia, which is approximately 13 miles from Cumming.

*Additional Undercover Purchases from PILLPUSHER*

28. After ROBERTS was initially identified in August 2020 from the physical and video surveillance at the Cumming Post Office, the FBI conducted additional undercover purchases of prescription drugs from PILLPUSHER (ROBERTS). Specifically:

| Date Ordered | Method of Order | Item Ordered | Date Received | Lab Analysis |
| --- | --- | --- | --- | --- |
| 8/16/2020 | Email | 14 tablets 20-mg dextroamphetamine-amphetamine (Adderall IR) | 8/20/2020 | Dextroamphetamine-amphetamine (Schedule II) |
| 8/31/2020 | Email | 10 pills 40-mg oxymorphone (Opana) | 9/8/2020 | Oxymorphone (Schedule II) |
| 9/25/2020 | Yellow Brick listings | 20 pills 80-mg oxycodone | 10/1/2020 | Oxycodone (Schedule II) |
| 9/30/2020 | Yellow Brick listings | 10 pills 40-mg oxymorphone (Opana) | 10/8/2020 | Results pending |
| 10/5/2020 | Yellow Brick listings | 40 pills 80-mg oxycodone | 10/8/2020 | Results pending |
| 10/13/2020 | Yellow Brick listings | 20 pills 80-mg oxycodone | 10/22/2020 | Results pending |

| 10/23/2020 | Yellow Brick listings | 10 tablets 2-mg alprazolam (Xanax) | 10/29/2020 | Results pending |
| 10/28/2020 | Yellow Brick listings | 10 pills 40-mg oxymorphone (Opana) | 10/29/2020 | Results pending |

29. As listed above, on September 25, October 5, and October 13, 2020, the UC placed an order with PILLPUSHER for 80-mg oxycodone pills. Notably, on each occasion, the pills arrived in foil-covered blister-packs labeled "Oxicodone Sandoz 80 mg." The lot number listed on all of the blister packs was "KC4290." Additionally, on October 23, 2020, the UC placed an order with PILLPUSHER for 2-mg alprazolam tablets. On this occasion, the pills arrived in foil-covered blister-packs labeled "Alprazolam Kern Pharma 2mg." Sandoz and Kern Pharma are both generic pharmaceutical manufacturers; Sandoz is headquartered in Germany, and Kern is headquartered in Spain.

30. Video surveillance at the Cumming Post Office on multiple occasions captured ROBERTS in the post office at approximately the same time as records show that the undercover packages were mailed.

*Physical Surveillance of ROBERTS*

31. Georgia DMV records listed a residential address in Duluth, Georgia, as the address associated with ROBERTS's driver's license. On or about October 19, 2020, FBI agents conducted physical surveillance at this residence. Additionally, agents collected garbage from a garbage can left out on the street in front of the residence. The garbage was subsequently examined for items of evidentiary value and these items were photographed.

32. Among the items located in the garbage from ROBERTS's residence were six empty boxes of 2-mg alprazolam manufactured by Kern Pharma. This labeling was consistent with that of the blister-packs of alprazolam subsequently ordered from PILLPUSHER. The

exterior packaging was labeled in Spanish and indicated that each box had contained 50 pills, for a total of 300 2-mg alprazolam pills. Alprazolam, as noted above, is more commonly known by the brand name Xanax and is a Schedule IV controlled substance. Notably, both before and after agents examined ROBERTS's trash, PILLPUSHER had a contemporaneous listing on his YELLOW BRICK vendor page for 2-mg Xanax, which matched the description of the contents of the recovered boxes.

33. Additionally, two empty boxes labeled "Oxicodone Sandoz 80mg" and bearing lot number "KC4290" were also recovered from ROBERTS's trash. This labeling was consistent with that of the blister-packs of 80-mg oxycodone ordered from PILLPUSHER.

34. As noted above, the package that the UC ordered from PILLPUSHER on October 13 was received on October 22, 2020. The package contained suspected oxycodone in blister-packs, and the blister-packs were labeled "Oxicodone Sandoz 80 mg" and lot number "KC4290." The return address for this package was listed as "Simple Strands, 115 Merchants Square, Cumming, GA 30040."

35. Also on October 22, 2020, ROBERTS was observed exiting his residence, entering his silver Buick, and driving to the Cumming Post Office. There, he dropped off multiple packages in a blue collection box in front of the Cumming Post Office. ROBERTS then drove back to his residence.

*The Intercepted Package*

36. The Postal Inspector examined the blue collection box that ROBERTS had used and recovered a total of eight packages; seven were Priority Mail Express mailers, and one was a Priority Mail mailer. The packages were addressed to locations throughout the United States, but they all bore the same return address of "Simple Strands, 115 Merchants Square, Cumming, GA

30040," identical to the package containing the UC order from PILLPUSHER that was received on October 22 in the Eastern District of Virginia.

37. The exteriors of the eight packages were photographed. The seven Priority Mail Express mailers were not seized so as not to alert ROBERTS to the investigation. The lone Priority Mail package was subjected to examination by a drug detection canine on October 23, 2020, but the dog did not alert on the package. Nevertheless, on October 28, 2020, a search warrant was issued from the Northern District of Georgia for the seized Priority Mail package. The Postal Inspector opened the package and found that the package contained a sealed plastic pouch containing dozens of white pills, totally approximately 60 grams. A photo is below:



One of the pills field-tested positive for the Schedule IV controlled substance tramadol. Tramadol was a drug advertised for sale on YELLOW BRICK by PILLPUSHER. These pills are pending submission for laboratory testing.

38. In total, as of November 23, 2020, law enforcement has ordered and seized a total of (a) 34 Adderall tablets of at least two types and strengths, (b) 100 oxycodone 80-mg pills of at least two different types, (c) 50 oxymorphone 40-mg pills, and (d) 10 alprazolam 2-mg pills from PILLPUSHER (ROBERTS) through either purchases on the YELLOW BRICK DNM or direct email orders with PILLPUSHER.

## CONCLUSION

39. The foregoing facts demonstrate that ROBERTS has been distributing prescription controlled substances through his use of the Darknet, specifically under the moniker PILLPUSHER and using the YELLOW BRICK DNM.

40. Accordingly, I submit that there is probable cause to believe that from in or around August 2020 to November 2020, within the Eastern District of Virginia and elsewhere, the defendant, CULLEN LATHAM ROBERTS, did unlawfully, knowingly, and intentionally distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

Respectfully submitted,

_____
Special Agent Samad D. Shahrani
Federal Bureau of Investigation

Attested to in accordance with the requirements of
Fed. R. Crim. P. 4.1 via telephone on November 25, 2020.

_____
The Honorable Ivan D. Davis
United States Magistrate Judge

13